Keith D. Washington
6265 Magnolia Cir.
Stone Mountain, GA 30087-6070

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

KEITH D. WASHINGTON,
*Plaintiff*

DOCKET# 04-12141-DPW

Vs

Massachusetts Commission Against Discrimination, *et al*
*Defendant(s)*

## PLAINTIFF'S PETITION FOR LEAVE TO FILE LEGAL OPINION IN SUPPORT OF HIS POSITION THAT DEFENSE CLAIMS OF ABSOLUTE IMMUNITY IS ERRONEOUS

In the interest of judicial economy and to assist this Court in ruling on Defendant's claim of Absolute Immunity, Plaintiff, request permission to enter in the record the U.S. Supreme Court's ruling in *Scheuer v Rhodes, 416 U.S. 232 (1974.* Petitioner in good faith believes this to be the appropriate **governing legal precedent**. A **highlighted** copy of this ruling, which has been downloaded from "Findlaw", is attached for the Court's ready reference.

Submitted: November 30, 2004

By: Keith D. Washington, pro se

**Attachment**
*Scheuer v Rhodes, 416 U.S. 232*

Cc: Charles M. Wyzanski,
Assistant Attorney General
Commonwealth of Massachusetts
One Ashburton Place
Boston, Massachusetts, 02108-1598

1


FindLaw
Legal News and Commentary
http://news.findlaw.com

Westlaw.
Click Here

Need a case now?

# U.S. Supreme Court

## SCHEUER v. RHODES, 416 U.S. 232 (1974)

416 U.S. 232

SCHEUER, ADMINISTRATRIX v. RHODES, GOVERNOR OF OHIO, ET AL.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 72-914.

Argued December 4, 1973.
Decided April 17, 1974. *

[ Footnote * ] Together with No. 72-1318, Krause, Administrator, et al. v. Rhodes, Governor of Ohio, et al., also on certiorari to the same court.

Petitioners, the personal representatives of the estates of students who were killed on the campus of a state-controlled university, brought these damages actions under 42 U.S.C. 1983 against the Governor, the Adjutant General of the Ohio National Guard, various other Guard officers and enlisted members, and the university president, charging that those officials, acting under color of state law, "intentionally, recklessly, willfully and wantonly" caused an unnecessary Guard deployment on the campus and ordered the Guard members to perform allegedly illegal acts resulting in the students' deaths. The District Court dismissed the complaints for lack of jurisdiction without the filing of any answer and without any evidence other than the Governor's proclamations and brief affidavits of the Adjutant General and his assistant, holding that respondents were being sued in their official capacities and that the actions were therefore in effect against the State and barred by the Eleventh Amendment. The Court of Appeals affirmed on that ground and on the alternative ground that the common-law doctrine of executive immunity was absolute and barred action against respondent state officials. Held:

> 1. The Eleventh Amendment does not in some circumstances bar an action for damages against a state official charged with depriving a person of a federal right under color of state law, and the District Court acted prematurely and hence erroneously in dismissing the complaints as it did without affording petitioners any opportunity by subsequent proof to establish their claims. Pp. 235-238.
>
> 2. The immunity of officers of the executive branch of a state government for their acts is not absolute but qualified and of varying degree, depending upon the scope of discretion and [416 U.S. 232, 233] responsibilities of the particular office and the circumstances existing at the time the challenged action was taken. Pp. 238-249.

471 F.2d 430, reversed and remanded.

BURGER, C. J., delivered the opinion of the Court, in which all Members joined except DOUGLAS, J., who took no part in the decision of the cases.

Michael E. Geltner argued the cause for petitioner in No. 72-914. With him on the briefs were Leonard J. Schwartz, Melvin L. Wulf, Joel M. Gora, Nelson G. Karl, Niki Z. Schwartz, and Walter S. Haffner. Steven A. Sindell argued the cause for petitioners in No. 72-1318. With him on the brief were Joseph M. Sindell and Joseph Kelner.

Charles E. Brown argued the cause for respondents in No. 72-914. With him on the brief were Robert F. Howarth, Jr., Delmar Christensen, and C. D. Lambros. R. Brooke Alloway argued the cause for respondents in No. 72-1318

With him on the brief was John M. McElroy.Fn

Fn [416 U.S. 232, 233]  Briefs of amici curiae urging reversal in both cases were filed by Mario G. Obledo and Sanford Jay Rosen for the Mexican American Legal Defense and Educational Fund, and by David E. Engdahl for the National Council of the Churches of Christ in the U.S. A. et al. Carl J. Character filed a brief for the National Bar Assn. as amicus curiae urging reversal in No. 72-1318.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari 1 in these cases to resolve whether the District Court correctly dismissed civil damage actions, brought under 42 U.S.C. 1983, on the ground that these actions were, as a matter of law, against the State of Ohio, and hence barred by the [416 U.S. 232, 234] Eleventh Amendment to the Constitution and, alternatively, that the actions were against state officials who were immune from liability for the acts alleged in the complaints. These cases arise out of the same period of alleged civil disorder on the campus of Kent State University in Ohio during May 1970 which was before us, in another context, in Gilligan v. Morgan, 413 U.S. 1 (1973).

In these cases the personal representatives of the estates of three students who died in that episode seek damages against the Governor, the Adjutant General, and his assistant, various named and unnamed officers and enlisted members of the Ohio National Guard, and the president of Kent State University. The complaints in both cases allege a cause of action under the Civil Rights Act of 1871, 17 Stat. 13, now 42 U.S.C. 1983. Petitioner Scheuer also alleges a cause of action under Ohio law on the theory of pendent jurisdiction. Petitioners Krause and Miller make a similar claim, asserting jurisdiction on the basis of diversity of citizenship. 2

The District Court dismissed the complaints for lack of jurisdiction over the subject matter on the theory that these actions, although in form against the named individuals, were, in substance and effect, against the State of Ohio and thus barred by the Eleventh Amendment. The Court of Appeals affirmed the action of the District Court, agreeing that the suit was in legal effect one against the State of Ohio and, alternatively, that the common-law doctrine of executive immunity barred action [416 U.S. 232, 235]  against the state officials who are respondents here. 471 F.2d 430 (1972). We are confronted with the narrow threshold question whether the District Court properly dismissed the complaints. We hold that dismissal was inappropriate at this stage of the litigation and accordingly reverse the judgments and remand for further proceedings. We intimate no view on the merits of the allegations since there is no evidence before us at this stage.

I

The complaints in these cases are not identical but their thrust is essentially the same. In essence, the defendants are alleged to have "intentionally, recklessly, willfully and wantonly" caused an unnecessary deployment of the Ohio National Guard on the Kent State campus and, in the same manner, ordered the Guard members to perform allegedly illegal actions which resulted in the death of plaintiffs' decedents. Both complaints allege that the action was taken "under color of state law" and that it deprived the decedents of their lives and rights without due process of law. Fairly read, the complaints allege that each of the named defendants, in undertaking such actions, acted either outside the scope of his respective office or, if within the scope, acted in an arbitrary manner, grossly abusing the lawful powers of office.

The complaints were dismissed by the District Court for lack of jurisdiction without the filing of an answer to any of the complaints. The only pertinent documentation 3 before the court in addition to the complaints were two proclamations issued by the respondent [416 U.S. 232, 236]  Governor. The first proclamation ordered the Guard to duty to protect against violence arising from wildcat strikes in the trucking industry; the other recited an account of the conditions prevailing at Kent State University at that time. In dismissing these complaints for want of subject matter jurisdiction at that early stage, the District Court held, as we noted earlier, that the defendants were being sued in their official and representative capacities and that the actions were therefore in effect against the State of Ohio. The primary question presented is whether the District Court acted prematurely and hence erroneously in dismissing the complaints on the stated ground, thus precluding any opportunity for the plaintiffs by subsequent proof to establish a claim.

When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test. Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.

> "In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (footnote omitted). [416 U.S. 232, 237]

See also Gardner v. Toilet Goods Assn., 387 U.S. 167, 172 (1967).

## II

The Eleventh Amendment to the Constitution of the United States provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ." It is well established that the Amendment bars suits not only against the State when it is the named party but also when it is the party in fact. Edelman v. Jordan, 415 U.S. 651 (1974); Poindexter v. Greenhow, 114 U.S. 270, 287 (1885); Cunningham v. Macon & Brunswick R. Co., 109 U.S. 446 (1883). Its applicability "is to be determined not by the mere names of the titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record." Ex parte New York, 256 U.S. 490, 500 (1921).

However, since Ex parte Young, 209 U.S. 123 (1908), it has been settled that the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law. Ex parte Young teaches that when a state officer acts under a state law in a manner violative of the Federal Constitution, he

> "comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." Id., at 159-160. (Emphasis supplied.)

Ex parte Young, like Sterling v. Constantin, 287 U.S. 378 (1932), involved a question of the federal courts' [416 U.S. 232, 238] injunctive power, not, as here, a claim for monetary damages. While it is clear that the doctrine of Ex parte Young is of no aid to a plaintiff seeking damages from the public treasury, Edelman v. Jordan, supra; Kennecott Copper Corp. v. State Tax Comm'n, 327 U.S. 573 (1946); Ford Motor Co. v. Dept. of Treasury, 323 U.S. 459 (1945); Great Northern Life Insurance Co. v. Read, 322 U.S. 47 (1944), damages against individual defendants are a permissible remedy in some circumstances notwithstanding the fact that they hold public office. Myers v. Anderson, 238 U.S. 368 (1915). See generally Monroe v. Pape, 365 U.S. 167 (1961); Moor v. County of Alameda, 411 U.S. 693 (1973). In some situations a damage remedy can be as effective a redress for the infringement of a constitutional right as injunctive relief might be in another.

Analyzing the complaints in light of these precedents, we see that petitioners allege facts that demonstrate they are seeking to impose individual and personal liability on the named defendants for what they claim - but have not yet established by proof - was a deprivation of federal rights by these defendants under color of state law. Whatever the plaintiffs may or may not be able to establish as to the merits of their allegations, their claims, as stated in the complaints, given the favorable reading required by the Federal Rules of Civil Procedure, are not barred by the Eleventh Amendment. Consequently, the District Court erred in dismissing the complaints for lack of jurisdiction.

## III

The Court of Appeals relied upon the existence of an absolute "executive immunity" as an alternative ground for

sustaining the dismissal of the complaints by the District Court. If the immunity of a member of the executive [416 U.S. 232, 239] branch is absolute and comprehensive as to all acts allegedly performed within the scope of official duty, the Court of Appeals was correct; if, on the other hand, the immunity is not absolute but rather one that is qualified or limited, an executive officer may or may not be subject to liability depending on all the circumstances that may be revealed by evidence. The concept of the immunity of government officers from personal liability springs from the same root considerations that generated the doctrine of sovereign immunity. While the latter doctrine - that the "King can do no wrong" - did not protect all government officers from personal liability, the common law soon recognized the necessity of permitting officials to perform their official functions free from the threat of suits for personal liability. 4 This [416 U.S. 232, 240] official immunity apparently rested, in its genesis, on two mutually dependent rationales: 5 (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good.

In this country, the development of the law of immunity for public officials has been the product of constitutional provision as well as legislative and judicial processes. The Federal Constitution grants absolute immunity to Members of both Houses of the Congress with respect to any speech, debate, vote, report, or action done in session. Art. I, 6. See Gravel v. United States, 408 U.S. 606 (1972); United States v. Brewster, 408 U.S. 501 (1972); and Kilbourn v. Thompson, 103 U.S. 168 (1881). This provision was intended to secure for the Legislative Branch of the Government the freedom from executive and judicial encroachment which [416 U.S. 232, 241] had been secured in England in the Bill of Rights of 1689 and carried to the original Colonies. 6 In United States v. Johnson, 383 U.S. 169, 182 (1966), Mr. Justice Harlan noted:

> "There is little doubt that the instigation of criminal charges against critical or disfavored legislators by the executive in a judicial forum was the chief fear prompting the long struggle for parliamentary privilege in England and, in the context of the American system of separation of powers, is the predominate thrust of the Speech or Debate Clause."

Immunity for the other two branches - long a creature of the common law - remained committed to the common law. See, e. g., Spalding v. Vilas, 161 U.S. 483, 498 -499 (1896).

Although the development of the general concept of immunity, and the mutations which the underlying rationale has undergone in its application to various positions are not matters of immediate concern here, it is important to note, even at the outset, that one policy consideration seems to pervade the analysis: the public interest requires decisions and action to enforce laws for the protection of the public. Mr. Justice Jackson expressed this general proposition succinctly, stating "it is not a tort for government to govern." Dalehite v. United States, 346 U.S. 15, 57 (1953) (dissenting opinion). Public officials, whether governors, mayors or police, legislators or judges, who fail to make decisions when [416 U.S. 232, 242] they are needed or who do not act to implement decisions when they are made do not fully and faithfully perform the duties of their offices. 7 Implicit in the idea that officials have some immunity - absolute or qualified - for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all. In Barr v. Matteo, 360 U.S. 564, 572 -573 (1959), the Court observed, in the somewhat parallel context of the privilege of public officers from defamation actions: "The privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government." See also Spalding v. Vilas, 161 U.S., at 498 -499.

For present purposes we need determine only whether there is an absolute immunity, as the Court of Appeals determined, governing the specific allegations of the complaint against the chief executive officer of a State, the senior and subordinate officers and enlisted personnel of that State's National Guard, and the president of a state-controlled university. If the immunity is qualified, [416 U.S. 232, 243] not absolute, the scope of that immunity will necessarily be related to facts as yet not established either by affidavits, admissions, or a trial record. Final resolution of this question must take into account the functions and responsibilities of these particular defendants in their capacities as officers of the state government, as well as the purposes of 42 U.S.C. 1983. In neither of these inquiries do we write on a clean slate. It can hardly be argued, at this late date, that under no circumstances can the officers of state government be subject to liability under this statute. In Monroe v. Pape, supra, MR. JUSTICE

of constitutional rights, privileges and immunities by an official's abuse of his position." 365 U.S., at 172. Through the Civil Rights statutes, Congress intended "to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." Id., at 171-172.

Since the statute relied on thus included within its scope the "'[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law,'" id., at 184 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)), government officials, as a class, could not be totally exempt, by virtue of some absolute immunity, from liability under its terms. Indeed, as the Court also indicated in Monroe v. Pape, supra, the legislative history indicates that there is no absolute immunity. Soon after Monroe v. Pape, Mr. Chief Justice Warren noted in Pierson v. Ray, 386 U.S. 547 (1967), that the "legislative record [of 1983] gives no clear indication that Congress meant to abolish wholesale all common-law immunities," id., at 554. The Court had [416 U.S. 232, 244] previously recognized that the Civil Rights Act of 1871 does not create civil liability for legislative acts by legislators "in a field where legislators traditionally have power to act." Tenney v. Brandhove, 341 U.S. 367, 379 (1951). Noting that "[t]he privilege of legislators to be free from arrest or civil process for what they do or say in legislative proceedings has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries," id., at 372, the Court concluded that it was highly improbable that "Congress - itself a staunch advocate of legislative freedom - would impinge on a tradition so well grounded in history and reason by covert inclusion in the general language . . ." of this statute. Id., at 376.

In similar fashion, Pierson v. Ray, supra, examined the scope of judicial immunity under this statute. Noting that the record contained no "proof or specific allegation," 386 U.S., at 553, that the trial judge had "played any role in these arrests and convictions other than to adjudge petitioners guilty when their cases came before his court," ibid., the Court concluded that, had the Congress intended to abolish the common-law "immunity of judges for acts within the judicial role," id., at 554, it would have done so specifically. A judge's

> "errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation." Ibid.

The Pierson Court was also confronted with whether immunity was available to that segment of the executive branch of a state government that is most frequently and intimately involved in day-to-day contacts with the citizenry and, hence, most frequently exposed to situations which can give rise to claims under 1983 - the local [416 U.S. 232, 245] police officer. Mr. Chief Justice Warren, speaking for the Court, noted that the police officers

> "did not defend on the theory that they believed in good faith that it was constitutional to arrest the ministers solely for using the ['white only'] waiting room. Rather, they claimed and attempted to prove that . . . [they arrested them] solely for the purpose of preventing violence. They testified, in contradiction to the ministers, that a crowd gathered and that imminent violence was likely. If the jury believed the testimony of the officers and disbelieved that of the ministers, and if the jury found that the officers reasonably believed in good faith that the arrest was constitutional, then a verdict for the officers would follow even though the arrest was in fact [without probable cause and] unconstitutional." Id., at 557.

The Court noted that the "common law has never granted police officers an absolute and unqualified immunity," id., at 555, but that "the prevailing view in this country [is that] a peace officer who arrests someone with probable cause is not liable for false arrest simply because the innocence of the suspect is later proved," ibid.; the Court went on to observe that a "policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." Ibid. The Court then held that

> "the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under 1983." Id., at 557.

When a court evaluates police conduct relating to an arrest its guideline is "good faith and probable cause." [416 U.S.

the range of decisions and choices - whether the formulation of policy, of legislation, of budgets, or of day-to-day decisions - is virtually infinite. In common with police officers, however, officials with a broad range of duties and authority must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office. Like legislators and judges, these officers are entitled to rely on traditional sources for the factual information on which they decide and act. 8 When a condition of civil disorder in fact exists, there is obvious need for prompt action, and decisions must be made in reliance on factual information supplied by others. While both federal and state laws plainly contemplate the use of force when the necessity arises, the decision to invoke military power has traditionally been viewed with suspicion and skepticism since it often involves the temporary suspension of some of our most cherished rights - government by elected civilian leaders, freedom of expression, of assembly, and of association. Decisions in such situations are more likely [416 U.S. 232, 247] than not to arise in an atmosphere of confusion, ambiguity, and swiftly moving events and when, by the very existence of some degree of civil disorder, there is often no consensus as to the appropriate remedy. In short, since the options which a chief executive and his principal subordinates must consider are far broader and far more subtle than those made by officials with less responsibility, the range of discretion must be comparably broad. In a context other than a 1983 suit, Mr. Justice Harlan articulated these considerations in Barr v. Matteo, supra:

> "To be sure, the occasions upon which the acts of the head of an executive department will be protected by the privilege are doubtless far broader than in the case of an officer with less sweeping functions. But that is because the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails. It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted - the relation of the act complained of to 'matters committed by law to his control or supervision,' Spalding v. Vilas, supra, at 498 - which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits." 360 U.S., at 573-574.

These considerations suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light [416 U.S. 232, 248] of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct. Mr. Justice Holmes spoke of this, stating:

> "No doubt there are cases where the expert on the spot may be called upon to justify his conduct later in court, notwithstanding the fact that he had sole command at the time and acted to the best of his knowledge. That is the position of the captain of a ship. But even in that case great weight is given to his determination and the matter is to be judged on the facts as they appeared then and not merely in the light of the event." Moyer v. Peabody, 212 U.S. 78, 85 (1909). (Citations omitted.)

Under the criteria developed by precedents of this Court, 1983 would be drained of meaning were we to hold that the acts of a governor or other high executive officer have "the quality of a supreme and unchangeable edict, overriding all conflicting rights of property and unreviewable through the judicial power of the Federal Government." Sterling v. Constantin, 287 U.S., at 397. In Sterling, Mr. Chief Justice Hughes put it in these terms:

> "If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases, the futility of which the State may at any time disclose by the simple process of transferring powers of legislation to the Governor to be exercised by him, beyond control, upon his assertion of necessity. Under our system of government, such a conclusion [416 U.S. 232, 249] is obviously untenable. There is no such avenue of escape from the paramount authority of the Federal Constitution. When there is a substantial showing that the exertion of state power has overridden private rights secured by that Constitution, the subject is necessarily one for judicial inquiry in an appropriate proceeding directed against the individuals charged with the transgression." Id., at 397-398.

Gilligan v. Morgan, by no means indicates a contrary result. Indeed, there we specifically noted that we neither held nor implied "that the conduct of the National Guard is always beyond judicial review or that there may not be

whether by way of damages or injunctive relief." 413 U.S., at 11-12. (Footnote omitted.) See generally Laird v. Tatum, 408 U.S. 1, 15-16 (1972); Duncan v. Kahanamoku, 327 U.S. 304 (1946).

## IV

These cases, in their present posture, present no occasion for a definitive exploration of the scope of immunity available to state executive officials nor, because of the absence of a factual record, do they permit a determination as to the applicability of the foregoing principles to the respondents here. The District Court acted before answers were filed and without any evidence other than the copies of the proclamations issued by respondent Rhodes and brief affidavits of the Adjutant General and his assistant. In dismissing the complaints, the District Court and the Court of Appeals erroneously accepted as a fact the good faith of the Governor, and took judicial notice that "mob rule existed at Kent State University." There was no opportunity afforded petitioners to contest [416 U.S. 232, 250] the facts assumed in that conclusion. There was no evidence before the courts from which such a finding of good faith could be properly made and, in the circumstances of these cases, such a dispositive conclusion could not be judicially noticed. We can readily grant that a declaration of emergency by the chief executive of a State is entitled to great weight but it is not conclusive. Sterling v. Constantin, supra.

The documents properly before the District Court at this early pleading stage specifically placed in issue whether the Governor and his subordinate officers were acting within the scope of their duties under the Constitution and laws of Ohio; whether they acted within the range of discretion permitted the holders of such office under Ohio law and whether they acted in good faith both in proclaiming an emergency and as to the actions taken to cope with the emergency so declared. Similarly, the complaints place directly in issue whether the lesser officers and enlisted personnel of the Guard acted in good-faith obedience to the orders of their superiors. Further proceedings, either by way of summary judgment or by trial on the merits, are required. The complaining parties are entitled to be heard more fully than is possible on a motion to dismiss a complaint.

We intimate no evaluation whatever as to the merits of the petitioners' claims or as to whether it will be possible to support them by proof. We hold only that, on the allegations of their respective complaints, they were entitled to have them judicially resolved.

The judgments of the Court of Appeals are reversed and the cases are remanded for further proceedings consistent with this opinion.

It is so ordered.

MR. JUSTICE DOUGLAS took no part in the decision of these cases.

**Footnotes**

[ Footnote 1 ] 413 U.S. 919 (1973).

[ Footnote 2 ] The Krause complaint states that the plaintiff is a citizen of Pennsylvania and expressly invokes federal diversity jurisdiction under 28 U.S.C. 1332. The Miller complaint states that the plaintiff is a citizen of New York. While the complaint does not specifically refer to jurisdiction under 28 U.S.C. 1332, it alleges facts which clearly support diversity jurisdiction. App. in No. 72-1318, p. 85. See Fed. Rule Civ. Proc. 8 (a) (1).

[ Footnote 3 ] In the Krause case, the Adjutant General and his assistant also filed brief affidavits. These seem basically directed to the motion for a change of venue and, in any event, make no substantial contribution to the jurisdictional or immunity questions.

[ Footnote 4 ] In England legislative immunity was secured after a long struggle, by the Bill of Rights of 1689: "That the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament," 1 W. & M., Sess. 2, c. 2. See Stockdale v. Hansard, 9 Ad. & E. 1, 113-114, 112 Eng. Rep. 1112, 1155-1156 (Q. B. 1839). The English experience, of course, guided the drafters of our

383 U.S. 169, 177-178, 181 (1966); United States v. Brewster, 408 U.S. 501 (1972). In regard to judicial immunity, Holdsworth notes: "In the case of courts of record . . . it was held, certainly as early as Edward III's reign, that a litigant could not go behind the record, in order to make a judge civilly or criminally liable for an abuse of his jurisdiction." 6 W. Holdsworth, A History of English Law 235 (1927). The modern concept owes much to the elaboration and restatement of Coke and other judges of the sixteenth and early seventeenth centuries. Id., at 234 et seq. See Floyd v. Barker, 12 Co. Rep. 23, 77 Eng. Rep. 1305 (K. B. 1607). The immunity of the Crown has traditionally been of a more limited nature. Officers of the Crown were at first insulated from responsibility since the King could claim the act as his own. This absolute insulation was gradually eroded. Statute of Westminster I, 3 Edw. 1, c. 24 (1275) (repealed); [416 U.S. 232, 240] Statute of Westminster II, 13 Edw. 1, c. 13 (1285) (repealed). The development of liability, especially during the times of the Tudors and Stuarts, was slow; see, e. g., Public Officers Protection Act, 7 Jac. 1, c. 5 (1609) (repealed). With the accession of William and Mary, the liability of officers saw what Jaffe has termed "a most remarkable and significant extension" in Ashby v. White, 1 Bro. P. C. 62, 1 Eng. Rep. 417 (H. L. 1704), reversing 6 Mod. 45, 87 Eng. Rep. 808 (Q. B. 1703). Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv. L. Rev. 1, 14 (1963); A. Dicey, The Law of the Constitution 193-194 (10th ed. 1959) (footnotes omitted). See generally Barr v. Matteo, 360 U.S. 564 (1959). Good-faith performance of a discretionary duty has remained, it seems, a defense. See Jaffe, Suits Against Governments and Officers: Damage Actions, 77 Harv. L. Rev. 209, 216 (1963). See also Spalding v. Vilas, 161 U.S. 483, 493 et seq. (1896).

[ Footnote 5 ] Jaffe, Suits Against Governments and Officers: Damage Actions, 77 Harv. L. Rev., at 223.

[ Footnote 6 ] Mr. Justice Frankfurter noted in Tenney v. Brandhove, 341 U.S., at 373 : "The provision in the United States Constitution was a reflection of political principles already firmly established in the States. Three State Constitutions adopted before the Federal Constitution specifically protected the privilege." See Coffin v. Coffin, 4 Mass. 1, 27 (1808). See also Kilbourn v. Thompson, 103 U.S. 168, 202 (1881).

[ Footnote 7 ] For example, in Floyd v. Barker, supra, Coke emphasized that judges "are only to make an account to God and the King" since a contrary rule "would tend to the scandal and subversion of all justice. And those who are the most sincere, would not be free from continual calumniations . . . ." 12 Co. Rep., at 25, 77 Eng. Rep., at 1307. See also Yaselli v. Goff, 12 F.2d 396, 399 (CA2 1926), aff'd per curiam, 275 U.S. 503 (1927). In Spalding v. Vilas, 161 U.S., at 498 , the Court noted: "In exercising the functions of his office, the head of an Executive Department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as entrusted to the executive branch of the government, if he were subjected to any such restraint."

[ Footnote 8 ] In Spalding v. Vilas, 161 U.S., at 498 , the Court, after discussing the early principles of judicial immunity in the country, cf. Randall v. Brigham, 7 Wall. 523, 535 (1869), Bradley v. Fisher, 13 Wall. 335 (1872), and Yates v. Lansing, 5 Johns. 282 (N. Y. 1810), noted the similarity in the controlling policy considerations in the case of high-echelon executive officers and judges: "We are of opinion that the same general considerations of public policy and convenience which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions, apply to a large extent to official communications made by heads of Executive Departments when engaged in the discharge of duties imposed upon them by law. The interests of the people require that due protection be accorded to them in respect of their official acts." [416 U.S. 232, 251]

Company | Privacy Policy Disclaimer

Copyright © 1994-2004 FindLaw